Filed 4/2/15  In re J.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061714 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J216493 & J296494) |
| v. | OPINION |
| A.Y. et al., | |
| Defendants; | |
| A.M. et al., | |
| Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Sharon S. Rollo, under appointment by the Court of Appeal, for Appellants.

Jean-Rene Basle, County Counsel, and Regina A. Coleman, Assistant County Counsel, for Plaintiff and Respondent.

1

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant, A.Y.

Liana Serobian, under appointment by the Court of Appeal, for Defendant, C.M.

Appellants and minors Andrew M. (Andrew) and K. M. (K.) appeal from the juvenile court's order terminating parental rights with regard to their younger siblings, Paige M. (Paige) and Jenna M. (Jenna). On appeal, Andrew and K. argue that the sibling relationship exception (Welf. and Instit. Code, § 366.26, subd. (c)(1)(B)(v)) applied. The parents, C.M. (father) and A.Y. (mother), filed separate appellate briefs also arguing that the sibling relationship exception applied, and they join in Andrew's and K.'s brief. Father also joins in mother's brief. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On August 7, 2010, the San Bernardino County Children and Family Services (CFS) filed section 300 petitions[1] on behalf of Jenna, Paige, K., Andrew, and V. M. (the children). At the time, Jenna was three years old, Paige was four years old, K. was five years old, Andrew was eight years old, and V. M. (V.) was nine years old. The petition alleged that the children came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The petitions included the allegations that mother and father (the parents) had failed to provide adequate housing, food, clothing, and medical treatment for the children, and that the parents' whereabouts were unknown.

---

[1] Where the records for each child are duplicative, the first such record appearing in the transcript will be cited.

2

*Detention*

The social worker filed a detention report and stated that the children were removed on August 8, 2007. At the time of removal, mother and the children had been residing in a local park for four days. Two of the children appeared to be ill with chicken pox. All of the children had varying degrees of sunburn, and they were extremely dirty. The children were hungry.

At a detention hearing on August 13, 2007, the court found a prima facie case to detain the children.

*Jurisdiction/disposition*

The social worker filed a jurisdiction/disposition report on August 29, 2007, recommending that the court declare the children dependents and provide both parents with reunification services. The social worker reported that the children were placed together in a foster home and were adjusting well.

A contested jurisdiction/disposition hearing was held on September 12, 2007. The matter was set contested by the parents, and the court ordered the parents and social worker to participate in mediation. Neither parent went to mediation. On October 2, 2007, the court sustained the petition and declared the children dependents of the court. The court found father to be the presumed father of the children. The court also ordered the parents to participate in reunification services and visitation.

*Six-month Status Review*

The social worker filed a six-month status review report on April 2, 2008, recommending that the parents continue to receive services. The parents were

3

participating in substance abuse treatment, parenting education, and anger management. The children remained placed together in the same foster home. Mother visited them on a consistent basis, but father did not. The court continued the children as dependents and continued the parents' reunification services.

*12-month Status Review*

The social worker filed a 12-month status review report on September 12, 2008, recommending that the children remain in their placement and the parents continue to receive services. The children were still in the same foster care home together. The parents were actively participating in their case plans. The court maintained the children in their foster placement and continued reunification services.

*18-month Status Review*

The social worker filed an 18-month status review report on March 6, 2009, and recommended that reunification services be terminated and a section 366.26 hearing be set. The social worker reported that father experienced a relapse and tested positive for illegal drugs on February 25, 2009. Furthermore, the parents had not been able to obtain a residence that provided a safe environment for the children. Thus, due to the parents exhausting the time limit for reunification services, the social worker recommended that services be terminated and a section 366.26 hearing be set to establish a permanent plan of legal guardianship. The social worker reported that the children had adjusted well to their current foster home, and the concurrent plan would be legal guardianship with the current caretakers, as a sibling group. The social worker stated that a possible alternative plan would be adoption, but noted that adoption of such a large sibling group by one

4

family would be difficult.  Nonetheless, any alternative plan would have to keep the siblings together, since they were bonded.  The social worker opined that it would be detrimental to separate them.  At a hearing on April 9, 2009, the court found that the parents had failed to complete the court-ordered treatment plan, and that custody by the parents would create a substantial risk of detriment.  The court further noted that the statutory time for reunification had lapsed.  The court terminated reunification services, maintained the children in their current placement, and set a section 366.26 hearing.

On July 9, 2009, at a nonappearance review hearing, CFS requested a change in plan from guardianship to a Planned Permanent Living Arrangement (PPLA) due to the fact that the current foster parents were no longer willing or able to take guardianship of the children.  The court ordered the children maintained in the current foster home under a PPLA and continued the matter.

*Section 366.3 Postpermanent Review*

The social worker filed a section 366.3 post permanent plan review report on July 31, 2009, and recommended the children remain in a PPLA.  The current foster parents were no longer willing to go through with the guardianship, based on the loss of funding with the change of plan.  The children had been placed together in the same foster home since their removal in August 2007, and they appeared to have a strong bond.  The social worker continued to pursue a more permanent plan, such as possible placement with relatives.

At a permanency planning hearing on August 11, 2009, the court continued the children as dependents.  It also found the permanent plan of placement in the current

foster home with the specific goal of "independent living with identification of a caring adult to serve as a lifelong connection" was appropriate.

The social worker filed another status review report dated February 9, 2010, stating that the current plan of PPLA remained appropriate. At the hearing on February 9, 2010, the court ordered the children maintained in their current placement.

The social worker filed a status review report dated August 9, 2010, and stated that the current plan of PPLA remained appropriate. However, the social worker reported that, due to a referral alleging physical abuse, the children were moved on July 17, 2010, to a different placement. They were now in the R. foster home. The prior foster parents denied any abuse and were still willing to take the children back if the allegations were determined to be unfounded. They were willing to take guardianship of all the children. At a hearing on August 9, 2010, the court ordered the permanent plan of placement in the R. foster home with the "specific goal of independent living with identification of a caring adult to serve as a lifelong connection."

The social worker filed a status review report dated February 9, 2011, recommending that the current PPLA for the children continued to be appropriate. The social worker noted that the children had been placed together since their initial removal, that they all had very close relationships, and that it was appropriate for them to remain placed together. At the hearing on February 9, 2011, the court maintained in the children in the R. home.

The social worker filed another status review report dated August 9, 2011, again noting that the children had close relationships and kept each other out of trouble. The court ordered that the children continue to stay in the R. foster home.

In a status review report dated February 9, 2012, the social worker reported that the children continued to do well in the R. home. The current foster parents were considering adoption of the children. The children had not visited with either parent since the last reporting period, since the parents' whereabouts were again unknown. At the hearing on February 9, 2012, the court found that the children's current placement remained appropriate.

The social worker filed a status review report dated August 3, 2012, and recommended that the court set a section 366.26 hearing. The children had still had no contact with the parents. The current foster parents had requested to obtain legal guardianship with the children. The social worker opined that the children were bonded with each other and that separating them at that time would be detrimental to their well-being. At a hearing on August 10, 2012, the court found that the current PPLA plan was no longer appropriate, and it modified the permanent plan to legal guardianship. The court continued the matter for a section 366.26 hearing. However, on September 21, 2012, the social worker informed the court that the current caregiver was no longer interested in seeking legal guardianship. Thus, the court vacated the section 366.26 hearing.

The social worker filed a status review report dated February 8, 2013 and noted that the PPLA previously ordered by the court continued to be the appropriate permanent

7

plan for the children. Although the foster mother again requested legal guardianship, the children all stated they did not want legal guardianship with the current foster family. The children were no longer happy in the home. V. ran away from the foster home and was subsequently placed with the maternal stepgrandmother on September 25, 2012. The other children continued to live in the R. family home. However, they believed that if the foster mother was to take legal guardianship of them, they would no longer be able to have contact with V. and the maternal stepgrandmother, since the foster mother refused to have contact with them. The social worker was assessing the situation and opined that it might be necessary to move the children to be closer to V. and the maternal step-grandmother.

On January 24, 2013, Andrew, K., Paige, and Jenna were moved out of the R. family home. Andrew was moved to the maternal stepgrandmother's home, where V. was living. The three other children were moved together to the B. foster family home. The B. family home was closer to the maternal stepgrandmother's home, making it easier to facilitate visits between the siblings. On February 8, 2013, the court approved the separate placements.

On May10, 2013, CFS reported that the maternal stepgrandmother had moved out of the family home, leaving V. and Andrew with other family members. The maternal stepgrandmother had been arguing with V. regularly. Placement was changed to extended family members, Mr. and Mrs. R., who resided at the same address.

On June 19, 2013, CFS notified the court that it was suspected that Jenna, Paige, and K. may have been sexually abused while in a previous foster home. A forensic interview and exam were set for June 24, 2013.

On July 11, 2013, a section 387 supplemental petition was filed concerning Andrew. His current caregivers requested that he be removed from their home, due to his inappropriate behavior and failure to follow the house rules. The court removed him from the home and placed him in the C. foster home. The following week, K. was also moved to the C. foster home, due to behavior issues.

The social worker filed a status review report dated August 9, 2013, and explained that K., Paige, and Jenna were previously in the B. home together; however, K. started threatening Paige and attempted to drown her at the beach. Jenna had to pull Paige from the water. Furthermore, K. had been taking her own things and placing them with Paige's things and saying that Paige was stealing. On July 14, 2013, K. gave a suicide note to the foster parent. Law enforcement was called, and it was determined that K. was not a threat to herself or her siblings. K. reported that she did not want to live with Paige and Jenna. She was moved to the C. foster home where Andrew resided, in order to separate her from them. Thus, Andrew and K. were placed together in the C. foster home, Jenna and Paige were placed together in the B. foster home, and V. was in the home of Mr. and Mrs. R. The social worker reported that all the children had open phone contact and at least two visits a month.

At the hearing on August 9, 2013, the court ordered the children to be maintained in their respective foster homes.

On August 19, 2013, Paige and Jenna were moved to the C. foster home with Andrew and K., after a referral alleged that foster mother B. had inflicted emotional abuse on K., when she was living in that home.

The social worker next filed a status review report dated February 7, 2014, and recommended that a section 366.26 hearing be set to order legal guardianship for V. and adoption for Andrew, K., Paige, and Jenna. All of the children had requested adoption with their current caregivers, except V., who requested legal guardianship with Mr. and Mrs. R. The court set a section 366.26 hearing for June 9, 2014, to determine the most appropriate plan.

*Section 366.26 and Section 388*

The social worker filed a section 366.26 report on June 3, 2014. The social worker recommended that the permanent plan for K., Paige, and Jenna be adoption. As to Andrew, the social worker recommended that he remain in his current placement with a PPLA. Andrew indicated that he wanted to remain living with his current caregivers, but did not want the court to order adoption as his permanent plan. However, K., Paige, and Jenna all stated that they wanted to be adopted by the current caregivers.

At the section 366.26 hearing on June 9, 2014, the parents set the matter contested. The social worker informed the court that V. now wanted to be adopted.

The court held a hearing on July 2, 2014, with regard to V. The court terminated parental rights and ordered adoption as the permanent plan. The court set a hearing for August 4, 2014, for the other children.

10

The social worker filed an addendum report dated August 4, 2014, and recommended with regard to Paige and Jenna, that parental rights be terminated and adoption be ordered as the permanent plan. The social worker recommended that Andrew and K. remain in a PPLA with the R. family. The social worker explained that Andrew and K. had been placed in the R. family home with V. after an incident where Andrew had become angry and aggressive with his foster mother. She requested him to be removed from her home (the C. foster home). K. was then no longer interested in being adopted with the C. family either. The social worker further noted that Paige and Jenna had expressed their desires to remain in their current foster home and for the adoption with their current foster parents to proceed. Paige and Jenna also stated that they felt intimidated by their older siblings, V., Andrew, and K. Paige and Jenna requested supervised visits and supervised phone calls with their siblings, so they would not have to "feel intimidated or demoralized by their older siblings." Paige and Jenna felt like they were being harassed by their older siblings. They stated that once their adoptions were finalized, they would be able to have sibling outings again, like day-long beach trips.

On August 8, 2014, Andrew and K. filed a section 388 petition requesting the court to modify its order setting a section 366.26 hearing and to limit the permanent plan for Paige and Jenna to legal guardianship or a PPLA. Rather than specifying the changed circumstances and best interests of the child on the section 388 form, Andrew and K. filed an attachment with the petition. The attachment did not state any changed circumstances, but only asserted that their request was made in Paige's and Jenna's best

11

interests. Andrew and K. alleged that they had lived together most of their lives, that they had taken a protective role with their younger siblings, and that their sibling relationships were important since they provided the only stability the children had. Andrew and K. alleged that permanent separation from them would be detrimental to their younger siblings.

The court held a hearing on August 11, 2014. Following testimony from Andrew and K., the court granted the section 388 petition in order to give Andrew and K. standing to object to the adoption of Jenna and Paige and to present evidence at the section 366.26 hearing. The court then proceeded with the section 366.26 hearing. The court noted that what made its decision difficult was that all of the children were articulate, and they all knew what they wanted. However, the court stated that the question was whether termination of parental rights or adoption would be detrimental to Paige and Jenna. The court noted that they were 10 and 11 years old, and that they were currently in a home where they wanted to be adopted by the caregivers. The court recognized there was a sibling bond with their older siblings, but decided that the sibling bond did not override the benefits of permanency and adoption. The court remarked that Paige and Jenna had basically been in the system their whole lives, that they were now at an age where they were able to make decisions regarding whether they wanted to be adopted, and that they clearly wanted to be adopted. The court proceeded to terminate parental rights, as it was in the best interests of Paige and Jenna. The court added that it hoped the prospective adoptive parents would allow visitation and perhaps counseling with Andrew and K. "so that there is some kind of repair of that relationship that has been damaged." The court

12

stated that there were perhaps some communication issues or jealousy between the siblings, and that it was hopeful that there could be a relationship between Paige and Jenna and their siblings at some point. The court further noted that Andrew and K. had not met their burden of showing that termination of parental rights as to Paige and Jenna would be detrimental or create a substantial interference with the sibling relationship. The court then ordered adoption as the permanent plan for Paige and Jenna.

ANALYSIS

The Sibling Relationship Exception Did Not Apply

Andrew, K., and the parents contend that the court erred in failing to apply the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v). We conclude that the sibling relationship exception did not apply here.

The sibling relationship exception applies when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "[T]he sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship."

13

(*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L.*).)

To show a substantial interference with a sibling relationship, the party opposing adoption "must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.)

The evidence here showed that all the siblings, in general, had close bonds. By the time of the section 366.26 hearing, Andrew, K., Paige, and Jenna had lived together for most of their lives. When they were not living together, they visited each other regularly. They had similar experiences while living in the same foster homes, and they had been through the dependency process together. However, their relationships were not always positive. In August 2013, the social worker reported that K. started threatening Paige and attempted to drown her at the beach. It was also reported that K. had been taking her own things and placing them with Paige's things, and then she accused Paige of stealing. Moreover, K. expressed that she did not want to live with Paige and Jenna. Thus, she was moved to the C. foster home where Andrew resided, in order to separate her from them. Additionally, Paige and Jenna reported that they felt intimidated, disturbed, and

14

demoralized by Andrew and K. to the point that they requested supervised visits and phone calls with their siblings. As the court noted, the relationships between Andrew and K., and Paige and Jenna, were damaged and needed to be repaired.

Furthermore, Andrew and K. failed to meet their burden of showing that termination of parental rights would be detrimental to Paige and Jenna. "[T]he sibling relationship exception permits the trial court to consider possible detriment to the child being considered for adoption, but not a sibling of that child." (*In re Celine R.* (2003) 31 Cal.4th 45, 54 (*Celine R.*).) At the section 388 hearing, Andrew merely testified that *he* would be "heartbroken" if he had to wait until he was 18 to see his siblings, because he wanted to see how they were growing up. When the court asked K. how it would change her life if Paige and Jenna were adopted, K. said, "It would be really sad. We hardly see them now." Other than Andrew and K. being sad, there was no evidence of any detriment to anyone.

"Moreover, even if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 952-953.) Here, if parental rights were terminated, Paige and Jenna would gain a permanent home through adoption. If parental rights were not terminated, Paige and Jenna would lose the permanent home their prospective adoptive parents were ready to provide for them. There was no chance that the parents would reunify with the children, since the statutory time for reunification had lapsed and the court had terminated their reunification services in 2009. Thus, valuing

15

Andrew's and K.'s continuing relationships with their younger siblings over adoption would deprive Paige and Jenna of the ability to belong to a family. As the court noted, Paige and Jenna clearly wanted to be adopted. They were happy in their current home and said they did not want to live anywhere else.

Finally, we note Andrew's and K.'s assertion that they were not asking for Jenna and Paige to be moved from their placement to another home. Rather, they were asserting that the court should have ordered a plan of legal guardianship, so that it could enforce an order for sibling contact. Andrew and K. add that the prospective adoptive parents had discontinued sibling contact before the section 366.26 hearing. It is unclear whether the prospective adoptive parents would allow postadoption visits between the siblings. Nonetheless, at this point in the proceedings, the focus was Jenna's and Paige's need for permanency and stability. (*Celine R.*, *supra*, 31 Cal.4th at p. 52.) Moreover, the legislative preference is for adoption. (*Id.* at p. 53.)

Considering that Jenna and Paige had lived in numerous foster homes over the course of this lengthy dependency, and that they clearly wanted to be adopted by their current caregivers, we conclude that the benefits of adoption outweighed the benefits of continuing their relationships with Andrew and K.

16

DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

KING

J.

MILLER

J.